[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-11585
_____

D. C. Docket No. 8:12-cr-00550-MSS-TGW-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DEMETRIUS RENALDO BOWERS,
a.k.a. Fat Cat Bowers,
a.k.a. Casino Bowers,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(January 22, 2016)

Before TJOFLAT and HULL, Circuit Judges, and HALL,[*] District Judge.

_____

\* Honorable J. Randal Hall, United States District Judge for the Southern District of
Georgia, sitting by designation.

HALL, District Judge:

This case principally concerns what inferences jurors may permissibly draw from identity evidence from multiple crimes.  A jury found Defendant-Appellant Demetrius Bowers guilty of eight counts of armed robbery in violation of 18 U.S.C. § 1951(a) and eight counts of carrying, using, and brandishing a weapon in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  The district court sentenced Bowers to 150 months for the § 1951(a) violations and to a mandatory 182 years for the § 924(c) violations, to run consecutively.  On appeal, Bowers argues that the district court erred in three ways: (1) by denying his motion to sever the charged counts; (2) by denying his motion for judgment of acquittal based on insufficient identity evidence; and (3) by applying § 924(c)'s mandatory sentencing provisions in violation of the Constitution.  After a thorough review of the case and with the benefit of oral argument, we affirm.

## I. BACKGROUND

### A.    The District Court Proceedings

On December 18, 2014, a grand jury charged Bowers with three counts of robbery in violation of 18 U.S.C. § 1951(a) and three corresponding counts of brandishing a weapon in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  In its pre-trial order, the district court ordered that all pre-trial motions be filed by January 14,

2

2013.  Besides an unopposed motion to continue the trial, Bowers did not file any motions by that date.

Subsequently, on April 16, 2013, a grand jury returned a superseding indictment charging Bowers with eight counts of armed robbery under 18 U.S.C § 1951(a) and eight counts of using, carrying, and brandishing a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  In light of the superseding indictment, the district court reopened the period for pre-trial motions and set a new deadline of May 1, 2013.  Again Bowers did not file any motions before the deadline.  On June 5, 2013, Bowers filed a motion to sever the sixteen counts into eight separate trials, one for each alleged robbery.  When the motion was filed, Bowers's trial was scheduled to start twelve days later on June 17, 2013.

In its order denying severance, the district court observed that "[a]t no time has Defendant filed a motion requesting additional time to file pretrial motions nor has he shown good cause for filing his motion to sever at this late date."  The court thus denied Bowers's motion as untimely.  The district court also denied Bowers's motion to sever on the merits, finding that joinder of the claims was proper and that any potential prejudice could be cured by use of Eleventh Circuit Pattern Jury Instruction B-10.2.

Thereafter, Bowers proceeded to trial on all sixteen counts. At the close of the Government's case, Bowers moved for judgment of acquittal on the grounds that the Government failed to present sufficient evidence identifying him as the perpetrator of all eight robberies. The court deferred ruling on the motion pursuant to Federal Rule of Criminal Procedure 29(b). Bowers later renewed his motion after the Government did not present a rebuttal case and the court again deferred its ruling. After a four-day trial, the jury found Bowers guilty on all sixteen counts. Bowers then renewed his motion a second time and also moved for a new trial. The court denied both motions.

Prior to sentencing, Bowers moved to declare 18 U.S.C. §§ 924(c)(1)(A)(ii) and 924(c)(1)(C)(i) unconstitutional on their face and as applied against him. After argument at the sentencing hearing, the district court denied Bowers's motion and sentenced him to consecutive terms of imprisonment of 140 months for the § 1951(a) violations and a mandatory 182 years for the § 924(c)(1)(A)(ii) violations. Bowers timely appealed the denial of his motions to sever, for judgment of acquittal, and challenging the constitutionality of his 182-year sentence for the § 924(c) convictions.

## B.    Evidence Presented at Trial

Because there are eight alleged robberies in this case, the evidence is relatively voluminous, although not particularly complex. The admitted evidence

4

consists primarily of witness descriptions of the robberies and the perpetrator, law enforcement testimony regarding the investigation, the crime scenes, DNA evidence, and cell phone "hit" evidence. We recount the evidence in detail to determine whether it was sufficient to support the jury's verdict. The evidence below is taken in the light most favorable to the government. *See United States v. Isnadin*, 742 F.3d 1278, 1303 (11th Cir. 2014).

### 1. Bowers's Ownership of a MetroPCS Cell Phone and Related Identifying Evidence

The following evidence was introduced to establish that Bowers possessed a cell phone that was connected to the robberies. In April 2012, a MetroPCS cell phone account was opened in the name of "Strizzle Young." The account's phone number was associated with a Kyocera Domino grape-colored cell phone. In June and November, two photographs of Bowers were saved to the phone, and in October a text message addressed to "Demetrius" was sent to the phone.

In September 2012, Bowers opened an account with Amscot Financial, a provider of financial services such as money transfers, which he used to receive three money transfers. Each time he received money via Amscot, he listed the number associated with the MetroPCS account as his mobile phone. On September 11, 2012, the first time he received a money transfer, Bowers listed 12464 Tansboro Street, Spring Hill, Florida, 34608 as his address. Testimony from Bowers's ex-girlfriend, who lived at that address, established that Bowers

5

lived there in September 2012 and that he moved out at an unspecified date in October. Each time he received money via Amscot, Bowers provided a copy of his Florida Driver's License, which describes Bowers as 5'10" tall. Additionally, Bowers used his EBT card in areas and at times that correspond with cell phone tower hits generated by the MetroPCS phone.

At the time of Bowers's arrest on November 21, 2012, he possessed a MetroPCS Kyocera Domino grape-colored cell phone. Officers called the number they believed to be associated with Bowers and the phone rang, at which point Bowers "became upset" and yelled to people in the area to turn off his phone. Further, on a call from the jail, he stated that "they got my calls logged," referring, apparently, to the MetroPCS call log that the Government later introduced at trial. On another call, a female speaker momentarily referred to Bowers as "Strizzle" before he immediately interrupted her. Bowers replied that she should "tighten up," she was "tripping," and clarified that he was referring to "what you chirping" and "what you just hollered."

The Government also introduced an incriminating text message sent from his phone. On October 29, 2012, after six of the robberies occurred, Bowers sent a message indicating he intended to move into a new residence that cost $1,000 a month in rent. A wage-and-hour report indicated that Bowers received only $1,649.07 in total wages during the second and third quarters of 2012.

6

An analyst and record custodian from MetroPCS testified as a fact witness regarding cell phone towers and telephone records. [1] He explained that when cell phones are carried from location to location while activated, they hit cell towers in the network. Notably, on MetroPCS's network, this only occurs while a call is taking place, not when a phone is simply turned on while traveling. Hit records are maintained by cell service providers' call logs, including MetroPCS. An agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (BATF) testified concerning the call logs and cell tower data. He determined that Bowers's cell phone was "not in use" during the robberies, but that the cell phone data during the surrounding hours "could not eliminate" Bowers as a possible perpetrator. His specific testimony regarding each robbery is addressed below.

### 2.    Papa John's (Tampa, Florida), 9/23/2012

The first charged robbery occurred on September 23, 2012 at 1:10 a.m. at a Papa John's restaurant on 7891 Gunn Highway in Tampa, Florida. The robber used a concrete paver to shatter a window adjacent to the entry door. Two employees were present when the robber entered. The first employee witness described the robber as an African-American male, taller than herself and a normal

---

[1] The Government offered the analyst as an expert, but the district court only allowed him to testify as a fact witness.

7

weight, wearing a  black turtle neck, ribbed ski mask and black shoes, and carrying a black gun.

The second employee witness described the robber as an African-American male, being approximately 6'0" tall and weighing a little less than 180 pounds. According to the employee, the robber carried a small-caliber black handgun and wore a dark long-sleeved shirt, dark pants, and gloves.  Notably, this employee also described the robber as wearing a knit mask that looked like a beanie that was rolled down with holes cut out of it.  He said it almost resembled a ski mask.

A Hillsborough County Sheriff's K-9 Deputy responded to the scene ten minutes after the robbery.  While searching the parking lot and area surrounding the Papa John's, the deputy noticed a dark object along a fence sixty yards away. As he approached, his canine alerted to the object.  The object was a black wool cap with two eye holes, but no mouth hole, cut out.  The cap was submitted to the Florida Department of Law Enforcement for DNA testing and returned four possible contributors of DNA on the cap's exterior; however, no major contributor could be determined.  Regarding the cap's interior, a crime laboratory analyst stated that there were at least three contributors of DNA on the interior cap sample and that one person was a "major contributor at all 15 areas, meaning one person contributed a greater quantity of DNA in the mixture than the other contributors." At that time, however, no suspect had been identified and the analyst did not

8

compare the cap's major DNA contributor to any other DNA samples. A second analyst testified that, at a later date, she ran a direct comparison of DNA collected from Bowers with the DNA profile of the cap's major contributor. The analyst found that Bowers's DNA was "an exact match" with the major contributor's. The analyst did, however, testify that the presence of Bowers's DNA as the major contributor could not establish that he wore the cap at the Papa John's robbery.

Additionally, the BATF agent testified that on September 22, at 11:17 p.m., Bowers's phone hit a cell tower approximately 20 to 30 miles from the Papa John's. No hits were recorded during the robbery, which occurred at 1:11 a.m. on September 23. At 2:19 a.m., his phone hit a tower approximately 10 miles from the Papa John's.[2]

### 3.    Pizza Hut (Largo, Florida), 9/25/2012

At approximately 12:31 a.m. on September 25, 2012, a robber used a brick to shatter the glass door to a Pizza Hut restaurant at 4335 East Bay Drive in Largo, Florida, which is in Pinellas County. There were two employees present at that time. The first employee testified that the robber then entered by proceeding underneath the "push bar" in the shattered door. Further, he testified that the robber wore dark clothes, including a black ski mask, and carried a black 9

---

[2] On appeal, Bowers does not challenge the admissibility of the cell phone evidence regarding the time and location of his calls.

millimeter Glock handgun.  He also testified that the robber instructed him to place money in a bag.  The second witness similarly testified that the robber was wearing dark clothing and a mask, and carried a black gun.

On this occasion, records placed Bowers's cell phone within a few miles of the store, with the last hit before the robbery occurring at 10:42 p.m. on September 24.  Thirteen minutes after the robbery, records showed that the cell phone hit towers moving eastward along the Howard Franklin Bridge, which spans Tampa Bay and connects Pinellas County to Hillsborough County.

### 4.    Domino's Pizza (Spring Hill, Florida), 9/27/2012

On September 27, 2012 at 12:15 a.m., a robbery occurred at the Domino's Pizza restaurant at 13081 Spring Hill Drive, in Spring Hill, Florida, approximately six and a half miles from Bowers's Tansboro Street residence.  The robber threw a green paver through the glass door and entered through the broken glass below the push bar.  Three employees were initially present, though two fled after seeing the robber enter.  All three employees saw a gun.  The employee who remained described the robber as wearing dark clothes, dark gloves, and a mask with small holes cut out by scissors.  He also described the robber as having some facial hair that protruded from the mask.  The BATF agent testified that a distinctive green paver was used to break the glass door at the Domino's and was recovered at the scene.  The agent checked the area surrounding Domino's and did not find a

similar paver.  But he found a similar paver at a residence about 150 yards from the Tansboro Street address where Bowers lived in September 2012.

On September 26, Bowers's phone hit a tower approximately four miles from the Domino's at 11:19 p.m.  Fourteen minutes after the robbery, his phone hit a tower approximately two miles away from the Domino's.

### 5.    Pizza Hut (Tampa, Florida), 10/7/2012

On October 7, at 1:06 a.m., the Pizza Hut restaurant at 902 Busch Boulevard in Tampa was robbed.  The manager, her husband, and their five-year-old daughter were present.  The manager testified that she saw a brick thrown through the door and then witnessed one robber climb through the broken glass.  He told her to give him the money, but the manager tossed a deposit bag filled with money toward the door instead.  According to her testimony, a second robber reached through the glass and grabbed the deposit bag from inside the restaurant.  The manager testified that the first robber was wearing a mask.  Her husband said the first robber was African-American and wore a long-sleeved shirt and gloves, but, unlike his wife, testified that the first robber wore a shirt wrapped around his face.  He described the gun as a black automatic gun with a chrome barrel.  The BATF agent testified that Bowers's phone hit a tower approximately four miles from the Pizza Hut at 12:20 a.m.  After the robbery, at 2:17 a.m., Bowers's phone hit a tower six miles away from the restaurant.

11

### 6.    Wendy's (Tampa, Florida), 10/14/2012

On October 14, at 2:41 a.m., a robbery occurred at a Wendy's restaurant on Bruce B. Downs Boulevard in Tampa.  An officer testified that the glass door was shattered by a rock or a piece of concrete.  Witness testimony and video evidence demonstrated that the robber wore gloves and a ski mask, and used a black and silver gun.  The robber demanded that money be placed in a bag.

The Government introduced video and still pictures from the robbery.  A still photo appears to show facial hair or a distinctive chin similar to Bowers.  The BATF agent also pointed out that the robber carried a gun in his right hand and wore a mask with a white label or tag on the outside.  Bowers's phone hit a tower less than one mile from the Wendy's approximately thirty minutes prior to the robbery.  After the robbery, Bowers's phone hit a tower less than four miles southwest of the Wendy's.

### 7.    Pizza Hut (Lutz, Florida), 10/16/2012

On October 16, at 11:30 p.m., a robbery occurred at a Pizza Hut restaurant in Lutz, Florida.  The only employee present testified that the front door was still unlocked when the robbery occurred.  Notwithstanding the door being unlocked, the robber threw a concrete brick through the glass door and climbed through the bottom.  The employee described the robber as an African-American male wearing black pants, a black shirt, black gloves, and a ski mask with eyes cut out.

12

According to her testimony, he also possessed a black gun.  He demanded she place money in a bag.  The responding officer who investigated the scene testified that it was the first time in his experience that he had seen a brick thrown through a glass door of an open business.

The BATF agent testified that at 10:23 p.m., Bowers's phone hit a tower approximately nine miles from the Pizza Hut. Seventeen minutes after the robbery, his phone hit a tower three miles from the restaurant.

### 8.    Burger King (Tampa, Florida), 11/1/2012

On November 1, at 3:06 a.m., a Burger King restaurant at 4103 W. Hillsborough in Tampa was robbed.  Two employees were present.  One witness testified that two masked robbers dressed in black broke the glass door with a concrete block to gain entry to the store and then jumped over the front counter. According to testimony, one robber had a black gun.  Video and photographic evidence showed both robbers dressed in black.  One robber wore black gloves and a mask with a white tag or label.

The BATF agent testified that Bowers's physical appearance was consistent with that of the robber with the mask with a white tag. He also testified that Bowers's phone hit a tower three miles from the robbery at 1:16 a.m.  Thirty minutes after the robbery, his phone hit a tower approximately six miles from the Burger King.

13

### 9.    Pizza Hut (Lutz, Florida), 11/4/2012

The final charged robbery occurred on November 4, 2012 at 11:30 p.m. at the same Pizza Hut in Lutz, Florida that was robbed on October 16.  The same responding officer from the October 16 robbery responded to this robbery and testified that the restaurant's glass door was unlocked, but had been smashed by a brick or block on this occasion as well.  The sole employee present testified that he heard the robber throw the brick at the door twice, breaking the glass on the second throw.  Because the hole was not big enough to crawl through, the robber simply opened the door and walked in.  The employee witness described the robber as wearing all black, with black gloves and a black mask with holes cut out, and carrying a black 9 millimeter gun.  He described the robber as an African-American male,  approximately 5'8" to 5'10" tall.  The robber demanded that he put money in a bag.

The BATF agent testified that at 10:20 p.m. Bowers's phone hit the same tower it did prior to the October 16 Lutz Pizza Hut robbery.  Five minutes after the robbery, his phone hit the same tower again.

### 10.    *Modus Operandi* **Evidence**

The BATF agent testified that the similarity and "boldness" of the robberies were the features that led him to believe that one individual or group of individuals

14

committed the robberies.  In particular, the agent testified on the distinctiveness of

the method of entry:

> Almost all the armed robberies I've investigated, at least for sure the armed robberies I've investigated as an BATF agent in which we review the crimes that were initially investigated by the local responding agency.
>
> When it's an occupied structure, especially at night when it's lit inside, entry is usually gained either mainly walking through the front door when the place is still open, or waiting for an employee to exit the store, either through a back door to empty the trash or walking to their car at the end of the day. They will usually take control of that person and use them to gain access into the business.
>
> This allows for—well, regardless, the—I have yet to see in my capacity as an BATF agent the abrupt entry where they throw a brick through the door. It went against what I've normally seen in that by throwing the brick or the paver, which we refer to, another thing that made me think it was the same individual, we refer to as a signature, it shattered the main entrance to the door that's illuminated or a glass entrance that can be observed from the outside. . . .

He also noted the similar descriptions of the gun used in the robbery and the timing

of the robberies.  Another officer, who responded to both the October 16 and

November 4 Pizza Hut robberies, also testified that these were the first robberies

he had seen where a robber threw a brick through an unlocked glass door of an

open business.

15

## II. DISCUSSION

Below we address each error raised by Bowers in the order of the proceedings below, beginning with his motion to sever.

### A.    Bowers's Motion to Sever

#### 1.    Standard of Review

As an initial matter, we must determine whether the pre-amendment version of Federal Rule of Criminal Procedure 12, which governed the district court proceedings, or the amended version of Rule 12, which went into effect on December 1, 2014, governs this appeal.   In their appellate briefs, Bowers and the Government addressed only the application of pre-amendment Rule 12.  In particular, the Government relied heavily on pre-amendment Rule 12(e)'s waiver provision and our prior circuit precedent reviewing the denial of untimely motions. *See* Fed. R. Crim. Proc. 12(e) (2013); *United States v. Smith*, 918 F.2d 1501, 1509 (11th Cir. 1990) (finding no abuse of discretion in denying an untimely motion where defendant did not argue good cause).

Meanwhile, between briefing in this case and oral argument, this Circuit ruled that amended Rule 12 would apply to cases on appeal where "just and practicable." *United States v. Sperrazza*, 804 F.3d 1113, 1121 (11th Cir. 2015).  In supplemental authority, the Government conceded that it would be just and practicable to apply amended Rule 12 to Bowers's appeal.  We agree.  Because

there is no reason amended Rule 12's application to this case on appeal would prejudice Bowers, *Sperrazza*'s "just and practicable" test is satisfied. *See id.*

That we should apply the amended rule in this case is clear; how to apply the rule is a different matter. Bowers moved to sever the indicted counts after the district court's pre-trial-motion deadline, but before his trial, and with no attempt to establish good cause for his delay. His motion was, therefore, untimely under pre-amendment Rule 12(e) and would likewise be untimely under amended Rule 12(c)(3). Under *Sperrazza*'s interpretation of amended Rule 12(c)(3), untimely motions are forfeited rather than waived. *Sperrazza*, 804 F.3d 1113 at 1121. Bowers's severance claim is therefore forfeited, making it entitled to plain-error review. Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 731, 113 S. Ct. 1770, 1776 (1993).

Applying plain-error review, "[w]e may reverse a conviction . . . if we find that four prongs are met: there must be (1) an error (2) that is plain and (3) that has affected the defendant's substantial rights; and if the first three prongs are satisfied, we may exercise discretion to correct the error if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Madden*, 733 F.3d 1314, 1322 (11th Cir. 2013) (citing *Olano,* 507 U.S. at 732, 113 S. Ct. at 1776 ).

17

### 2.    Analysis

In applying plain-error review, the first step is to identify an error committed by the district court; therefore, we review the denial of severance to determine if the district court committed error.

When reviewing motions to sever, we first address whether joinder of the counts was proper under Federal Rule of Criminal Procedure 8(a) before proceeding to a prejudice analysis under Rule 14(a).  *See United States v. Barsoum*, 763 F.3d 1321, 1337 (11th Cir. 2014).  Bowers never challenged joinder, and we agree with the district court that Rule 8(a)'s "same or similar character" prong was satisfied.  If joinder is appropriate, then Rule 14(a) gives district courts the discretion to "order separate trials of counts" when "the joinder of offenses . . . appears to prejudice a defendant . . . ."  Fed. R. Crim. P. 14(a).  For the denial of a motion to sever to be error under Rule 14(a), a defendant must demonstrate that failure to sever "result[ed] in compelling prejudice against which the district court could offer no protection."  *United States v. Walser*, 3 F.3d 380, 385 (11th Cir. 1993).  In *Walser*, we defined the test for compelling prejudice as

> whether under all the circumstances of a particular case it is within the capacity of jurors to follow a court's limiting instructions and appraise the independent evidence against a defendant solely on that defendant's own acts, statements, and conduct in relation to the allegations contained in the indictment and render a fair and impartial verdict.

*Id.* at 386–387.  And if a jury can do so, then no compelling prejudice results.  *Id.* at 387.  Even where there may be some risk of prejudice, "if the possible prejudice may be cured by a cautionary instruction severance is not required."  *Id.*  Further, "absent evidence to the contrary, we presume that the jury followed the court's instructions . . . ."  *Id.* (citing *United States v. Badia*, 827 F.2d 1458, 1466 (11th Cir. 1987)).

In Bowers's view, events at trial reveal that the jury was unable to follow the district court's instruction and that compelling prejudice occurred from the jointly tried counts.  This prejudice allegedly occurred in two related ways: jury confusion and the impermissible cumulation of evidence.  Regarding jury confusion, Bowers argues that the Government's presentation of evidence, particularly how they "shifted back and forth among the eight robbery cases," led to  confusion.  In support, he points to one juror asking for a "timeline as to each count."  He concludes on this point by alleging that "the jury was apparently left confused and overwhelmed," leading to a conviction without sufficient evidence as to the individual charges.

The alleged confusion is not enough to satisfy the compelling-prejudice standard.  It is worth noting that Bowers conceded that the robberies occurred on the dates alleged in the indictment, and substantial evidence was presented at trial that they in fact did.  Given what was disputed in this case—*who* the robber was,

not when the robberies occurred—it was more important that the Government introduced evidence of the individual robberies together than strict adherence to the chronology of the robberies. In sum, it is unremarkable that a juror might want a timeline in a case with multiple alleged offenses, and it is conclusory to suggest this alleged confusion resulted in compelling prejudice in a case where the order and dates of the robberies were not disputed and not particularly relevant to what was in dispute.[3]

Bowers also argues that the jury may have improperly cumulated the evidence to infer guilt. In his view, the presence of eight alleged robberies in the same trial "likely bolstered the Government's evidence as to the first-in-time robbery," as well as the other seven robberies. This, however, is merely speculation and is not supported by the record. *See Barsoum*, 763 F.3d at 1337 (rejecting an argument that the jury may have cumulated evidence as speculation). Besides the alleged juror confusion discussed above, nothing during the trial suggested the jury could not properly weigh the evidence. Simply put, the jury was not invited to find Bowers guilty by improperly cumulating unrelated evidence from joined counts. As we explain *infra* Part II.B.2, it is the relatedness of the

---

[3] The only chronological relevance of the robberies' dates concerns the evidence of when Bowers was living at 12464 Tansboro Street. Bowers's ex-girlfriend's testimony established that he lived there in September and moved out on an unspecified date in October. The jury was capable of understanding that testimony's implications regardless of the order in which the robberies were presented.

20

joined robberies that permitted the jury to use identity evidence from other robberies to determine the robber's identity.

Finally, in many cases we have discussed how jury instructions can cure the potential prejudice from improperly cumulating the evidence. For instance, in *Walser* the district court "instructed the jury to consider each charge in the indictment separately and not to permit a verdict on one count to affect deliberations regarding another count." *Walser*, 3 F.3d at 387; *see also Barsoum*, 763 F.3d at 1337; *United States v. York*, 428 F.3d 1325, 1334 (11th Cir. 2005); *United States v. Hersh*, 297 F.3d 1233, 1244 (11th Cir. 2002). In its pre-trial order denying Bowers's motion to sever, the district court stated its intention to include Eleventh Circuit Pattern Instruction B-10.2 in its jury charges and, consistent with its order, the district court did so.[4] There is no indication that the jury was unable

---

[4] Eleventh Circuit Pattern Instruction B-10.2 provides:

> Each count of the indictment charges a separate crime. You must consider each crime and the evidence relating to it separately. If you find the Defendant guilty or not guilty of one crime, that must not affect your verdict for any other crime.

> I caution you that the Defendant is on trial only for the specific crimes charged in the indictment. You're here to determine from the evidence in this case whether the Defendant is guilty or not guilty of those specific crimes.

> You must never consider punishment in any way to decide whether the Defendant is guilty. If you find the Defendant guilty, the punishment is for the Judge alone to decide later.

21

to follow the district court's charge to consider the counts separately. In sum, Bowers has not overcome the presumption that jurors are able to follow the court's instruction to separately consider the evidence relating to each count.

Finding error in the district court's failure to sever counts requires "more than some prejudice . . . be shown; the appellant must demonstrate that he received an unfair trial and suffered compelling prejudice." *Walser*, 3 F.3d at 386 ( quoting *United States v. Harmas*, 974 F.2d 1262, 1269 (11th Cir.1992)). Bowers can only speculate about the possibility of prejudice. Further, if he did suffer any prejudice, it was "not 'compelling' to the extent that 'he received an unfair trial.'" *United States v. Slaughter*, 708 F.3d 1208, 1213–14 (11th Cir. 2013) (quoting *Walser*, 3 F.3d at 386). Because Bowers cannot demonstrate that he suffered compelling prejudice from the joinder of claims, the district court did not commit error, much less plain error, in denying his motion. *See United States v. Soto*, 794 F.3d 635, 657 (6th Cir. 2015) (holding that, where there was no error in the denial of

22

severance under Federal Rule of Criminal Procedure 14(a), there was likewise no plain error).[5]

## B.    Sufficiency of the Evidence

### 1.    Standard of Review

We review *de novo* whether the evidence presented at trial is sufficient to support the jury's verdict. *Isnadin*, 742 F.3d at 1303. "[We] consider whether, under the totality of the circumstances, there is sufficient evidence to support a jury verdict when the facts are viewed in the light most favorable to the government." *United States v. Mieres-Borges*, 919 F.2d 652, 658 (11th Cir. 1990). "Evidence is sufficient to support a conviction if a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009) (internal quotations and citations omitted).

---

[5] In some of our severance cases, we have discussed whether evidence that was admitted at trial would have been admissible at a hypothetical severed trial. *E.g.*, *United States v. Lopez*, 649 F.3d 1222, 1238 (11th Cir. 2011) (finding that co-defendant's statement would have been admissible in severed trial as co-conspirator's statement). But even if the evidence would be inadmissible in such a trial, compelling prejudice does not necessarily result from a joined trial. *United States v. Harper*, 680 F.2d 731, 734 (11th Cir. 1982) ("admissibility is not required in order for the denial of severance to be within the district court's discretion"). Here, Bowers never argued to the district court or on appeal that evidence from the other robberies would have been inadmissible at a severed trial. We therefore decline to engage in a lengthy hypothetical on this point. We note only that, in a hypothetical severed trial, under Federal Rule of Evidence 404(b), *modus operandi* evidence and other extrinsic evidence are admissible to prove identity, and a reasonable juror could have found by a preponderance of the evidence that Bowers committed the extrinsic robberies, thus permitting admission subject to Federal Rule of Evidence 403. *See United States v. Whatley*, 719 F.3d 1206, 1217–19 (11th Cir. 2013); *see also United States v. Miller*, 959 F.2d 1535, 1538 (11th Cir. 1992) (en banc).

23

Further, "[i]t is not enough for a defendant to put forth a reasonable hypothesis of innocence, because the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt." *United States v. Thompson*, 473 F.3d 1137, 1142 (11th Cir. 2006) (citing *Mieres-Borges,* 919 F.2d at 656).

Additionally, "no distinction is to be made between the weight given to either direct or circumstantial evidence." *Mieres-Borges*, 919 F.2d at 657 (quoting *United States v. Gonzalez*, 719 F.2d 1516, 1521 (11th Cir.1983)). But "[w]here the [G]overnment relies on circumstantial evidence, 'reasonable inferences, and not mere speculation, must support the jury's verdict.'" *United States v. Klopf*, 423 F.3d 1228, 1236 (11th Cir. 2005) (quoting *United States v. Perez-Tosta*, 36 F.3d 1552, 1557 (11th Cir.1994)).

### 2.    Analysis

Bowers challenges the sufficiency of the evidence on the jury's conviction on all sixteen counts. In particular, he disputes the sufficiency of the evidence identifying him as the perpetrator of the eight robberies. Below we consider Bowers's challenge in two parts. First, we address whether there is sufficient evidence that the same individual committed the eight robberies in question, and, second, we discuss whether sufficient evidence identifies Bowers as that individual. We hold that a reasonable juror could have found beyond a reasonable

24

doubt that Bowers committed all eight robberies and found Bowers guilty on all sixteen counts.

The evidence established that the eight robberies in question are sufficiently similar that a reasonable juror could conclude that each was committed by the same individual. We proceed from the general similarities to the most specific. The eight robberies were committed over six weeks between September 23, 2012 and November 4, 2012. The robberies were committed in Hernando, Hillsborough, and Pinellas Counties. All eight robberies were committed against fast food restaurants. More specifically, six of the eight robberies were against pizza restaurants, including the same Pizza Hut on two occasions. The robberies were all committed at night, with the six pizza restaurant robberies being particularly close in time—between 11:30 p.m. and 1:10 a.m.

Moving to more specific instances of similarity, the witness descriptions of the perpetrator support the jury's conclusion that the same individual committed all eight robberies. The robber was consistently described as an African-American male who was, for example, six-feet tall, a little bigger than 5'8", or between 5'8" and 5'10" tall. Regarding his weight, witnesses described him as "average weight," "slender . . . weighing between 150 to 180 pounds," and weighing more than one witness who was 130 pounds. The robber was described as wearing all black and a mask. The mask was variously described as a "ski mask," "knit," "wool," or a

25

"beanie" that had been modified to have eye holes.[6]  These descriptions were consistent with surveillance video and still photographs introduced from the Burger King and Wendy's robberies that depicted a robber wearing a long-sleeved black shirt and a black mask with a white label on the back.

Finally, and most importantly, the Government presented evidence of a unique method of entry that was consistent among the robberies.  On most occasions, the robber approached the customer entry door and threw a brick or piece of concrete through the glass below the "push" bar.  Once the lower glass was broken, the robber then entered by crouching and walking through the door, under the bar.[7]  Similarly, at the Papa John's robbery, the robber threw a concrete paver through the store's front window, adjacent to the entry door.  Testimony by the BATF agent and another officer supported the conclusion that entry by breaking the glass of an entry door with a brick at an occupied or open business was unique to these robberies.

------

[6] One witness described the robber as wearing a shirt wrapped across his face, but another witness from the same robbery described the same black knit mask consistent with the other robberies.  The jury was free to credit the testimony of the latter witness.  Additionally, some witnesses described the mask as having a hole for the mouth as well as the eyes.  Given the other consistencies in the robberies, the jury could conclude that the witnesses' memories of the mouth hole were faulty.  In any event, taken in the light most favorable to the Government, such a minor inconsistency in the descriptions of the mask does not demonstrate a different perpetrator.

[7] At the November 4 Pizza Hut robbery, the robber threw a brick through the lower glass, but, because the glass was only partially shattered, proceeded to enter by opening the door in the typical way.

26

There are, however, some inconsistencies between the robberies. Most notably, two robberies featured two perpetrators. During the October 7 Pizza Hut robbery, a store employee threw the restaurant's deposit bag toward the entry door and a second robber reached from outside the door to retrieve it. And at the November 1 Burger King robbery, two people broke the glass door with a concrete block and robbed the restaurant. The Government, however, presented video and still pictures that showed a robber wearing a mask with a white label or tag at both the Burger King robbery, which two robbers committed, and the October 14 Wendy's robbery, which one robber committed. A reasonable juror could conclude that this white-label robber was present at all eight robberies, even if joined by a second person for two robberies. Additionally, there are slight discrepancies between the witness descriptions regarding the gun used, the mask and other clothing worn, and the robber's physical appearance. Those discrepancies are minor in nature and the jury was free to conclude that they resulted more from imperfect witness memories than from material differences in the robberies.

Notwithstanding these differences, taking the evidence in the light most favorable to the Government, a reasonable juror could conclude that the same person committed all eight robberies. That conclusion is supported by generally consistent witness descriptions, the similarity in the restaurants targeted, the

27

relative consistency in time of day, the short period of time during which all robberies were committed, the geographic proximity of the robberies, and the consistent method of entry. All told, the robber used a consistent and unique *modus operandi* in his commission of these robberies. *Cf. Whatley*, 719 F.3d at 1217–19 (discussing, in the context of admission of evidence, the similarity among robberies required to establish a *modus operandi*). The question then becomes, could a reasonable juror conclude beyond a reasonable doubt that Bowers was the robber? Answering that question requires different evidence, which we now address.

The primary evidence linking Bowers to the robberies includes: (1) DNA evidence from the Papa John's robbery; (2) witness descriptions of the robber; (3) cell phone hit evidence; (4) Bowers's own inculpatory statements; and (5) the similarity between green pavers near Bowers's Tansboro Street residence and the one found at the Domino's robbery.

Perhaps the most important piece of evidence is the mask found at the first robbery. The mask was discovered approximately 150 yards from the entrance to the Papa John's, around the corner of the small shopping center that included the Papa John's, and close to a fence that divided the stores from nearby residences. The "mask" is actually a black wool cap that was modified to have eye holes and was apparently worn by pulling it over the perpetrator's head and across his face,

28

at which point it resembled a ski mask.  The modified cap found at the Papa John's

is consistent with witness descriptions of the "mask" used at the other robberies.

An expert from the Florida Department of Law Enforcement testified that

Bowers's DNA is the "predominant" match with DNA found on the inside of the

cap.  As Bowers pointed out at trial, the expert could not conclude whether he wore

the mask the night of the robbery.  Nevertheless, as we discuss in more detail

below, the presence of a cap possessing Bowers's DNA that matches the

description of the mask worn by the robber is circumstantial evidence that the jury

may properly consider.

Additionally, Bowers's own body type was consistent with witness

descriptions of the robber.  Bowers's driver's license lists him  as 5'10" tall.

Surveillance footage of the Burger King and Wendy's robberies shows a robber

wearing a long-sleeved black shirt and a black mask with a white tag.  According

to the BATF agent's testimony, that robber's physical appearance resembles

Bowers's.  Additionally, one witness testified that he could see that the robber had

facial hair or a goatee and video and photographs from the Wendy's robbery also

showed what appeared to be the robber's facial hair.  In its order denying Bowers's

motion for judgment of acquittal, the district court observed that Bowers had a

goatee that was consistent with the testimony and video.  The jury also could

observe Bowers's goatee and physical appearance during the trial.

29

Additionally, the testimony of the BATF agent and the call logs introduced at trial place Bowers in relative proximity to each of the robberies. As an initial matter, substantial evidence supported Bowers's possession of the MetroPCS Kyocera Domino cell phone during the relevant six-week period. *See supra* Part I.B.1. Testimony established that whenever an incoming or outgoing call is made on MetroPCS's network, the cell phone "hits" a tower within two miles of the phone's location. The testimony made clear that the cell phone only hits towers while a call is connected and not when it is merely on or, for instance, a call is made but not answered. The call logs and the agent's testimony place Bowers's cell phone and, by inference, Bowers in the general vicinity and often close proximity of the robberies.[8] Further, Bowers never hit a tower during a robbery, which is consistent with him not making or accepting any calls during the robberies. The most salient feature of the call logs is the relation between the timing of the hits and the distance from the robberies when they occurred. On each occasion, pre- and post-robbery hits are consistent with an inference that Bowers drove to and from the robbery.

A jury could, of course, make a reasonable inference of innocence from these call logs. For instance, that no calls ever connected while the robberies were

---

[8] For greater detail on the proximity of the cell tower hits from each robbery, see *supra* Parts I.B.2–9.

30

occurring could simply be a reflection of the short time the robberies took, rather than evidence that Bowers turned his cell phone off or refrained from placing calls during the robberies. Or, for another example, hitting towers in the Tampa area could reflect the realities of driving in a dense city with numerous towers where, at any given time, a driver could innocently drive by these restaurants. But we think the jury could infer the less innocent explanation that on eight separate occasions, late at night or in the early morning, Bowers was present at the robberies.[9]

The remaining pieces of evidence corroborate the evidence already discussed. For one, Bowers's text message suggests that he had enough money to rent a $1,000 per month apartment. Given that Bowers's wage-and-earnings report indicates he made only $1,649.07 in the second and third quarters of 2012, the jury was free to infer that some of his extra money was derived from the six robberies that took place prior to the text message. Moreover, on multiple occasions Bowers attempted to hide his possession of his MetroPCS cell phone. This began, of course, by registering it under an alias rather than his full name and continued until he was arrested and directed others to turn off his phone.

---

[9] Below we discuss how the cell tower hits and other evidence allow certain inferences to be drawn from the DNA evidence that may otherwise be impermissible. Similarly, the DNA evidence allows the jury to infer more from the cell tower hit evidence than would otherwise be permissible. As should be clear, this is not a case where the jury was presented with simply a suspicious correlation between cell tower hits and robbery locations.

Finally, one of the pavers used by the robber has a particular connection to Bowers. The perpetrator used a green paver to break the door of Domino's Pizza on September 27, 2012. The BATF agent testified that the green paver had a "distinctive" appearance and that none like it was found near the Domino's. There were, however, similar green pavers found at a residence approximately 150 yards from Bowers's Tansboro Street residence. Bowers's access to the unique kind of paver used at the Domino's robbery permits the inference that he committed the robbery in question. Though not a particularly strong piece of evidence in its own right, it is part of the totality of evidence the jury could consider.

No one piece of evidence discussed above is dispositive in this case. But courts instruct jurors to consider the totality of the evidence presented to determine a verdict. Conversely, courts instruct jurors not to improperly cumulate evidence. Said another way, courts instruct jurors to consider the totality of evidence *related* to each crime while not using guilt of one crime as a substitute for evidence on other charged crimes or using evidence related to one crime to convict on distinct, unrelated crimes. We are convinced the jury did the former and not one of the latter in this case. Considered in total and in the light most favorable to the Government, sufficient evidence identifies Bowers as committing the eight charged robberies.

Bowers's contention related to the DNA evidence warrants further discussion. Bowers argues that reliance on the DNA evidence from the Papa John's robbery requires an impermissible inference that, because his DNA was the predominant match on the mask, he therefore was wearing the mask on the night in question. In support, he cites *United States v. Bonner*, 648 F.3d 209 (4th Cir. 2011). In *Bonner*, two disguised men, one of whom was wearing a New York Yankees baseball hat, robbed a Subway. *Id.* at 211. Later that night, the police recovered a Yankees hat behind the Subway, which was identified as worn by the robber. *Id.* at 212. The Government argued that, because the defendant's DNA was the "predominant" match on the hat, "it was reasonable for the jury to infer that he was wearing the hat on the night of the robbery." *Id.* at 214. The DNA expert testified, however, that "he could not conclude who last wore the hat based on the DNA." *Id.* The Fourth Circuit held that "any assumption that Bonner was the last wearer is an impermissible inference by the jury." *Id.*[10] Three reasons

---

[10] Other evidence was presented at trial, but was not discussed in detail by *Bonner*. The Fourth Circuit summarized the evidence as:

> (1) a hat with multiple DNA matches worn by Bonner was also worn by one of the robbers; (2) Bonner's wallet, discovered in the alleged getaway car; (3) phone records showing calls from Bonner's cell phone to [his girlfriend] and [his cousin] the night after the robbery; and (4) a separate phone record showing a call from a nearby gas station to [his girlfriend].

33

supported that holding. First, equally plausible scientific inferences supported

innocence. *Id.* at 214–15. Second, the argument that a jury could draw a scientific

inference from the predominance of the defendant's DNA to his wearing the

Yankees hat that night was contrary to the evidence in the record. *Id.* at 215. And,

finally, a commitment to scrutinizing forensic evidence counseled against allowing

the jury to make an unsupported scientific inference. *Id.*

To resolve this issue, we do not need to decide whether it is an

impermissible *scientific* inference to infer that Bowers was wearing the mask the

night of the Papa John's robbery from only his DNA match, as the Fourth Circuit

did in *Bonner*. Instead, we hold that, where *modus operandi* evidence supports the

inference that the same individual committed multiple robberies, it is permissible

---

*Bonner*, 648 F.3d at 214. The Fourth Circuit noted that the district court found that the content of the cell phone calls above was not in the record and therefore could have been innocuous. *Id.* at 213. Further, the district court discounted the evidence of the call from the gas station because the call was hours *after* the police dogs had tracked the scent from the Yankees hat to the station. *Id.* at 213–14.

Besides recounting the district court's views, the Fourth Circuit itself did not comment on the non-DNA evidence and its existence appears to not factor into the opinion's reasoning. The Fourth Circuit possibly analyzed the case in this manner because the Government had explicitly argued that the scientific inference was a permissible one, notwithstanding the expert's contrary testimony. *Id.* at 214 ("in this case, the government asked the jury to draw unwarranted inferences based on two unconnected pieces of scientific evidence through argument instead of specialized knowledge"). We think *Bonner* is best understood as resting on the permissible inferences that can be drawn from the DNA evidence standing alone. *See id.* at 215 (discussing three reasons that support the decision, all of which concern scientific evidence). Therefore, we limit our discussion on *Bonner* to the DNA evidence and the inferences that may be drawn from it.

34

to consider identity evidence from the other robberies, including, in this case, consistent physical descriptions and cell phone records, to corroborate the identity DNA evidence from an initial robbery.  *See United States v. Burston*, 159 F.3d 1328 (where Government "presented evidence that the same *modus operandi* was used in [two] robberies . . . evidence of involvement in one provided some evidence of involvement in the other.").  In other words, the additional identity evidence from the other robberies transforms an impermissible *scientific* inference under *Bonner* (i.e., that the defendant was wearing the hat on the night of the robbery based on the predominance of his DNA), to a permissible one supported by identity evidence from other robberies with a consistent *modus operandi*.

We acknowledge that this is a close case.  It is a notably weaker case than *United States v. Tate*, 586 F.3d 936 (11th Cir. 2009), for example, which Bowers attempted to distinguish at trial and on this appeal.[11]  In *Tate*, the defendant was charged with five bank robberies.  *Id.* at 939.  Those robberies were connected by a

---

[11] Bowers also cites and distinguishes the evidence found to be sufficient in *United States v. Feliciano*, 761 F.3d 1202 (11th Cir. 2014).  His reliance on *Feliciano* is unhelpful.  In that case the defendant's conviction on three robbery related offenses turned on the credibility of testimony by two alleged co-conspirators against him.  *Id.* at 1206–07.  Credibility determinations are the exclusive province of the jury, unless the testimony is "incredible as a matter of law."  *Id.* at 1206 (quoting *United States v. Chastain*, 198 F.3d 1338, 1351 (11th Cir. 1999)).  In *Feliciano*, direct testimony from two co-conspirators established that the defendant committed the robberies; the jury credited that testimony and found the defendant guilty.  *Id.* at 1207.  The instant case is not about credibility determinations; rather, it is about the reasonableness of juror inferences drawn from circumstantial evidence.  *Feliciano* therefore is so dissimilar as to be an unhelpful comparison for Bowers.

consistent *modus operandi* where the robber, dressed in sunglasses and a baseball hat, would hand the teller a withdrawal slip and demand money. *Id.* at 939–41. The defendant's fingerprints were found on the withdrawal slips from the robberies. *Id.* at 944. Tellers from two of the banks testified that the defendant was the robber. *Id.* at 940–41, 944. The distinction between *Tate* and this case is the superior evidence presented in *Tate* that the defendant committed at least two of the robberies. From there, the jury was able to infer from *modus operandi* evidence that the defendant committed the other robberies as well. *Id.* at 945 (citing *United States v. McDowell*, 250 F.3d 1354, 1364 (11th Cir. 2001)).

In Bowers's case, the *modus operandi* evidence permits the jury to conclude that one person committed all eight robberies. That conclusion makes identity evidence from one robbery *related* to the other robberies. The relatedness of the identity evidence means that jurors may properly consider identity evidence from, for instance, the Papa John's robbery to determine the identity of who robbed the Domino's, and so on. The totality of the identity evidence presented in this case is sufficient to convict Bowers on all sixteen counts. Therefore, the district court's denial of Bowers's motion for judgment of acquittal is affirmed.

## C.    Sentencing

Bowers's third and final enumeration of error is a three-pronged challenge to the constitutionality of his sentence. In particular, Bowers argues that his

36

mandatory sentence under 18 U.S.C. § 924(c) violates: (1) separation of powers; (2) due process and equal protection; and (3) the Eight Amendment.   As Bowers concedes, these arguments are foreclosed by prior Supreme Court and Eleventh Circuit precedent.  Because Bowers seeks to preserve a record of these issues, we likewise recount the relevant facts and the precedents that control our decision.  In the end, we affirm the district court and find Bowers's sentence constitutional.

We review constitutional challenges to a sentence *de novo*.  *United States v. Steed*, 548 F.3d 961, 978 (11th Cir. 2008).  Additionally, we are bound by the prior panel decisions of this Court until those holdings are abrogated by the Supreme Court or by this Court sitting *en banc*.  *Cargill v. Turpin*, 120 F.3d 1366, 1386 (11th Cir. 1997).

We begin with the mechanics of § 924(c) as applied in this case.  The jury found Bowers guilty of eight violations of 18 U.S.C. § 924(c)(1)(A)(ii)  (Counts 2, 4, 6, 8, 10, 12, 14, and 16 ).  Violations of § 924(c) carry mandatory-minimum sentences that vary depending on the defendant's predicate conduct and criminal history.  Relevant to Bowers's case, § 924(c)(1)(A)(ii) provides that "if [a] firearm is brandished" during the commission of any crime of violence, the perpetrator "shall be sentenced to a term of imprisonment of not less than 7 years."  Further, § 924(c)(1)(C)(i) provides that "second or subsequent" § 924(c) violations carry a

"sentence[] to a term of imprisonment of not less than 25 years."[12]  Finally,

§ 924 (c)(1)(D)(ii) prohibits courts from ordering that the sentences under both this

subsection and the underlying crime of violence run concurrently.  Together these

three provisions mandated Bowers's sentence.  The district court sentenced Bowers

to seven years imprisonment for Count 2 and twenty-five years for each of Counts

4, 6, 8, 10, 12, 14, and 16, running consecutively.  In sum, for the violations of

§ 924(c), Bowers was sentenced to 182 years in prison, to run consecutively after

his 140 months for the § 1951(a) violations.

Beginning with the separation of powers challenge, this Court has rejected

separation of powers arguments against mandatory-minimum sentences in two

published opinions.  *United States v. Paige*, 604 F.3d 1268, 1274 (11th Cir. 2014)

(per curiam); *United States v. Holmes*, 838 F.2d 1175, 1178 (11th Cir. 1988).  In

*Holmes*, we held that the defendant's "argument that the mandatory minimum

sentence requirements violate the separation of powers doctrine is without force."

*Holmes*, 838 F.2d at 1178.  We reasoned, "[i]t is for Congress to say what shall be

a crime and how that crime shall be punished . . . ."  *Id.* (quoting *United States v.*

*Smith*, 686 F.2d 234, 239 (5th Cir.1982)).  Likewise, in *Paige*, we affirmed a

---

[12] This Court previously held, and the Supreme Court later confirmed, that additional
§ 924(c) counts charged in the same indictment are second and subsequent for purposes of
§ 924(c)(1)(A)(ii). *United States v. Rawlings*, 821 F.2d 1543, 1545 (11th Cir. 1987); *see also*
*Deal v. United States*, 508 U.S. 129, 113 S. Ct. 1993 (1993).

mandatory fifteen-year sentence pursuant to 18 U.S.C. § 2251(e) over the defendant's separation of powers challenge. *Paige*, 604 F.3d at 1274 . Besides these two opinions, we have only addressed this issue in unpublished opinions that note the binding nature of prior circuit precedent. *E.g.*, *United States v. Garrastequi*, 371 F. App'x 22, 24 (11th Cir. 2010) (per curiam). Once again we are bound by our precedent until a ruling of the Supreme Court or this Court sitting *en banc* abrogates *Holmes* and *Paige*; hence, Bowers's separation of powers challenge must fail.

Bowers also challenges § 924(c)'s mandatory-sentencing provisions on the grounds that they deprive him of an individualized sentencing proceeding in violation of due process and equal protection. His brief cites due process and equal protection together, but, in truth, only argues a due process violation. Because he concedes this issue under current precedent, we decline to separately address equal protection and turn to his due process challenge.

In Bowers's view, the mandatory-sentencing provisions denied him due process by effectively sentencing him to life in prison without consideration of mitigating circumstances, including his "individualized history and character . . . or the circumstances of the offense." The Supreme Court has held—for purposes of the Eighth Amendment— that an individualized sentencing determination is not required in non-capital cases. *Harmelin v. Michigan*, 501 U.S. 957, 995, 111 S. Ct.

2680, 2702 (1991).[13]  With respect to *due process*, we have held that the lack of individualized sentencing determinations under § 924(c) does not violate the Constitution.  *United States v. Hamblin*, 911 F.2d 551, 555 (11th Cir. 1990). Accordingly, Bowers's due process challenge is foreclosed.

Finally, Bowers argues that his sentence violates the Eighth Amendment's prohibition of cruel and unusual punishment.  "[T]he Eighth Amendment contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'"  *Ewing v. California*, 538 U.S. 11, 20, 123 S. Ct. 1179, 1185 (2003) (quoting *Harmelin*, 501 U.S. at 996-997, 111 S.Ct. at 2702 (Kennedy, J., concurring in part and concurring in judgment)).  Generally, sentences within the statutory limits are "neither excessive, nor cruel and unusual under the Eighth Amendment."  *United States v. Moriarity*, 429 F.3d 1012, 1024 (11th Cir. 2005).  "This is so because we accord substantial deference to Congress, as it possesses 'broad authority to determine the types and limits of punishments for crimes.'"  *United States v. Raad*, 406 F.3d 1322, 1323 (11th Cir. 2005) (quoting *Solem v. Helm*, 463 U.S. 277, 289, 103 S. Ct. 3001, 3009 (1983)).  Further, the Supreme Court has held that the mandatory nature of a sentence is irrelevant for Eighth Amendment purposes.

---

[13] *Harmelin* is a fractured opinion. On the individualized sentencing issue, Justice Scalia's opinion speaks for the Court while on other issues, including the proportionality issue discussed *infra*, Justice Kennedy's concurrence, as the narrowest grounds, is considered the Court's opinion.  *United States v. Farley,* 607 F.3d 1294, 1339–40, 1339 n.30 (11th Cir. 2010).

*Harmelin*, 501 U.S. at 994–995, 111 S. Ct. at 2701; *id.* at 1006, 111 S. Ct. at 2707–08 (Kennedy, J., concurring).  Instead, the sentence should be evaluated as if it were imposed by the sentencing court in the exercise of its discretion.  *United States v. Farley*, 607 F.3d 1294, 1343 (11th Cir. 2010).

To determine whether a particular non-capital sentence violates the Eighth Amendment,

> a reviewing court must make a threshold determination that the sentence imposed is grossly disproportionate to the offense committed and, if it is grossly disproportionate, the court must then consider the sentences imposed on others convicted in the same jurisdiction and the sentences imposed for commission of the same crime in other jurisdictions.

*Reynolds*, 215 F.3d 1210, 1214 (11th Cir. 2000) (citing *United States v. Brant*, 62 F.3d 367, 368 (11th Cir. 2000)).  The Supreme Court has counseled that "successful disproportionality challenges should be 'exceedingly rare.'" *Farley*, 607 F.3d at 1337 (quoting *Hutto v. Davis*, 454 U.S. 370, 374, 102 S. Ct. 703, 704–05 (1982)).  In part, this is because "we lack clear objective standards to distinguish between sentences for different terms of years." *Harmelin*, 501 U.S. at 1001, 111 S. Ct. at 2705.

With that framework in mind, the threshold question then is whether Bowers's 182-year sentence is "grossly disproportionate" to the offenses committed, namely brandishing a firearm during the course of eight robberies.

Supreme Court and Eleventh Circuit precedent have set a high bar for a sentence to be "grossly disproportionate." For example, the Supreme Court in *Harmelin* found that a sentence of life without parole was not grossly disproportionate for a first time offender convicted of cocaine possession. *Harmelin*, 501 U.S. at 1001. Likewise, we have upheld a mandatory life sentence without parole for a defendant convicted of trafficking in and possession of methamphetamine with two prior felony drug convictions. *United States v. Hoffman*, 710 F.3d 1228 (11th Cir. 2013) (per curiam). And in *Farley* we upheld a mandatory thirty-year sentence for aggravated sexual abuse of a child under 18 U.S.C. § 2241(c). *Farley*, 607 F.3d at 1343. In fact, this Court has never found a non-capital sentence of an adult to violate the Eighth Amendment. *Id.* at 1343; *accord United States v. McGarity*, 669 F.3d 1218, 1256 n.57 (11th Cir. 2012) (noting the same).

In support of his argument, Bowers mentions that the sentencing guideline range was 210–262 months, and the mandatory-minimum sentence "essentially multiplied that range ten-fold, calling for the imposition of a sentence of 2,184 months." But, as discussed above, prior Supreme Court and Eleventh Circuit cases have found that greater sentences, for less serious conduct, for defendants with less serious criminal histories were not grossly disproportionate. *See also United States v. Clark*, 634 F.3d 874, 877–78 (6th Cir. 2011) (affirming a 189-year sentence for seven armed robberies). In the present case, Bowers has been convicted of

42

brandishing a firearm during eight separate robberies and the district court imposed a mandatory 182-year sentence. But in *Harmelin* the defendant was sentenced to life imprisonment without parole, "the second most severe penalty permitted by law," *Harmelin*, 501 U.S. at 1001, 111 S. Ct. at 2705, for possessing 672 grams of cocaine. *Id.* at 961. Given the severity of the committed offenses, and in light of *Harmelin*, we hold that Bowers's sentence is not grossly disproportionate to the offending conduct; therefore, it does not violate the Eighth Amendment.

\* \* \*

There is no doubt that the consequences of Bowers's convictions are severe. In affirming his sentence, we follow two of the oldest principles of our federal structure. First, Congress possesses the power, as limited by the Constitution, to define crimes and their punishments. *Cf. United States v. Hudson*, 11 U.S. 32, 34, 7 Cranch 32, 34, 3 L. Ed. 259 (1812) ("The legislative authority of the Union must first make an act a crime, affix a punishment to it, and declare the Court that shall have jurisdiction of the offence."). Second, we are bound to follow the decisions of the Supreme Court and our prior panels. *See Martin v. Hunter's Lessee*, 14 U.S. 304, 348, 1 Wheat. 304, 348 (1816) (discussing, in the context of Supreme Court review of state court judgments, the importance of uniform interpretation and application of the law); The Federalist No. 22 (Alexander Hamilton) ("To avoid the confusion which would unavoidably result from the contradictory decisions of

43

a number of independent judicatories, all nations have found it necessary to establish one court paramount to the rest, possessing a general superintendence, and authorized to settle and declare in the last resort a uniform rule of civil justice.").

Some may believe that § 924(c)'s severe mandatory minimums "do[] not deter crime as much as [they] ruin[] lives." *Deal v. United States*, 508 U.S. 129, 146 n.10 (Stevens, J., dissenting) (quoting *United States v. Jones*, 965 F.2d 1507, 1521 (8th Cir. 1992)). This may particularly be so when "second or subsequent" convictions occur in the same case, rather than in separate proceedings. *See id.* at 139–42; *see also* Erik Luna & Paul G. Cassell, *Mandatory Minimalism*, 32 Cardozo L. Rev. 1, 80–81 (2010) (advocating, among other reforms, Congressional amendments to reform § 924(c)'s "second or subsequent" provision into a "true recidivist" law). Congress, however, could rationally conclude that mandatory sentences are appropriate. The common principle among our precedent is that the Constitution grants Congress the power to do so. *Farley*, 607 F.3d at 1343; *Hamblin*, 911 F.2d at 555–56; *Holmes*, 838 F.2d at 1178. Because Bowers's arguments are foreclosed, we affirm his sentence.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is

**AFFIRMED**.

44