[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12811

_____

D.C. Docket No. 6:17-cr-00131-CEM-TBS-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EDSON GELIN,
JIMMY FERNETUS,
RAYMOND MICHAEL AYAP,
GERARDSON NORGAISSE,
KISSINGER ST. FLEUR,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(April 15, 2020)

Before JORDAN, TJOFLAT, and TRAXLER,[*] Circuit Judges.

_____

[*] The Honorable William B. Traxler, Jr., Senior United States Circuit Judge for the Fourth Circuit, sitting by designation.

PER CURIAM:

This appeal involves the convictions and sentences of five defendants—Edson Gelin, Jimmy Fernetus, Raymond Michael Ayap, Gerardson Norgaisse, and Kissinger St. Fleur—who participated in a drug trafficking conspiracy in Orlando, Florida. After a seven-day trial, a jury found them guilty of conspiracy to distribute five kilograms or more of cocaine and 280 grams or more of cocaine base, as well as several other narcotics charges. The jury also found Mr. Fernetus and Mr. Gelin guilty of possessing a firearm in furtherance of a drug trafficking offense.

Four of the defendants—Mr. Gelin, Mr. Ayap, Mr. Norgaisse, and Mr. St. Fleur—appeal their convictions, raising individual challenges to the sufficiency of the evidence, challenging certain evidentiary rulings, and contesting the district court's refusal to give a buyer-seller instruction. Three of the defendants—Mr. Gelin, Mr. Fernetus, and Mr. St. Fleur—also appeal their sentences, arguing that the mandatory minimum sentencing structure is unconstitutional on various grounds, that their sentences are substantively unreasonable, and that the First Step Act should be retroactively applied to them. After review of the record and the parties' briefs, and with the benefit of oral argument, we affirm the defendants' convictions and sentences.

## I

Based on evidence the government presented at trial, the facts are as follows.

Eric Jean Gilles, the leader of the conspiracy, operated a cocaine-trafficking organization out of two houses in Orlando: the 18th Street house and the Grand Street house. He used a house in Miami as a stash house, where his suppliers dropped off the drugs for him to pick up. After pleading guilty to the charges against him, Mr. Gilles became a cooperating witness for the government and provided key testimony against the other defendants at trial.

## A

Mr. Gilles testified that Mr. Gelin worked for him from 2013 to 2016. In 2013, he hired Mr. Gelin to transport cocaine from Miami to Orlando. Mr. Gelin traveled to Miami once or twice a month, picking up one to four kilograms of cocaine on each trip. He would then sell the cocaine out of the Orlando houses, and he carried a gun while he worked.

According to Mr. Gilles, when he traveled to Haiti in 2014 he put Mr. Gelin in charge of his houses and cellphone, telling him to take care of his customers. When Mr. Gilles returned from Haiti in 2016, Mr. Gelin told him that the cocaine supply had slowed. Mr. Gilles asked his Miami supplier to "front" his organization two kilograms of cocaine and directed Mr. Gelin to pick up the drugs.

3

On June 7, 2016, Mr. Gelin traveled from Orlando to the Miami stash house to pick up the two kilograms of cocaine. The next day, as he was traveling north on the Florida Turnpike, officers stopped him for speeding. He was traveling 76 miles-per-hour in a 70 miles-per-hour zone. When a K-9 handler walked her dog around the car, the dog indicated that he smelled narcotics. Two deputies searched the car and found the two kilograms of cocaine and numerous cell phones, among other things.

**B**

Mr. Gilles also testified that he brought Mr. Fernetus into his drug organization in 2016. He testified that, like Mr. Gelin, Mr. Fernetus carried a firearm while he worked.

Another cooperating witness, Rufus White, testified that he made controlled purchases of cocaine from the two Orlando houses. Each time, he would call Mr. Gelin in the presence of law enforcement officers to arrange a cocaine purchase, and then pick up the cocaine—sometimes from Mr. Gelin and sometimes from Mr. Fernetus or someone else at one of the houses.

**C**

William Arocho of the Orlando Police Department testified that law enforcement officers obtained a wiretap on one of the cellphones that Mr. Gilles'

4

organization used.  Mr. Ayap was a frequent caller overheard on the wiretap and was captured discussing crack cocaine with Mr. Gilles.

Mr. Gilles testified that by 2015 or 2016, Mr. Ayap was frequently purchasing 14 grams of crack cocaine from him at a time, and occasionally would purchase as much as an ounce at a time.  Mr. Gilles testified that sometimes he "would front him [crack cocaine] because he would come too often, too fast."  D.E. 338 at 99.  In addition, Mr. Gilles testified that sometimes Mr. Ayap would bring customers to either the 18th Street or Grand Street houses "to help" him, *id.* at 101, and that Mr. Ayap told him that his customers liked the product that he was obtaining from Mr. Gilles.

Officer Arocho also testified that law enforcement installed pole cameras to record the vehicles and people visiting the two Orlando houses.  They saw Mr. Ayap's gold Lexus visiting both houses numerous times and connected intercepted phone calls to times when his car went to the houses.

On March 3, 2017, after one of Mr. Ayap's visits to the Grand Street house, officers followed his car until they observed a traffic infraction.  They tried to stop him, but Mr. Ayap refused to pull over.  As the officers pursued Mr. Ayap, they saw him throw something out of his car window, which they later determined to be 8.4 grams of crack cocaine.  Sergeant Donald Kollar of the Orlando Police Department testified that 8.4 grams is a distribution amount.

5

When Mr. Ayap eventually stopped his car, the officers saw that he had white powder on his shorts and shirt and that there was a clear plastic baggie that had been ripped open on the floorboard of the car. Mr. Ayap was arrested, and during the search incident to arrest officers found $3,185 in cash on him.

**D**

Investigators also identified Mr. Norgaisse on the wiretap, and they connected his calls with vehicles that he was using to frequent the Orlando houses. His car was sometimes seen making multiple short visits to the Orlando houses on the same day.

Mr. Gilles testified that Mr. Norgaisse came to the 18th Street and Grand Street houses to deal drugs with him and Mr. Fernetus in 2017. Mr. Norgaisse would purchase an ounce to two-and-a-half ounces of cocaine at a time.

According to Mr. Gilles, Mr. Norgaisse was frequently with Mr. St. Fleur. Officer Arocho testified that investigators sometimes heard Mr. Norgaisse say on the wiretap that he was going to send someone else to one of the houses, after which Mr. St. Fleur would arrive. Mr. St. Fleur's black Mustang was seen at both houses at least a dozen times, and on one occasion, Mr. St. Fleur was identified as the driver.

On April 11, 2017, after Mr. Norgaisse's car had been seen at the 18th Street house, investigators stopped him for a traffic infraction. Mr. Norgaisse was driving, and Mr. St. Fleur was in the passenger seat. Both consented to a search, and investigators found 73 grams of cocaine hidden in Mr. St. Fleur's underwear.

6

## II

A federal grand jury indicted Mr. Gelin, Mr. Fernetus, Mr. Ayap, Mr. Norgaisse, Mr. St. Fleur, and several other codefendants on one count of conspiracy to possess with intent to distribute five kilograms or more of cocaine and 280 grams or more of cocaine base, *see* 21 U.S.C. § 846, between 2014 and 2017. The grand jury also indicted Mr. Gelin on four counts of distributing and possessing with intent to distribute various quantities of cocaine, *see* 21 U.S.C. § 841, one count of aiding and abetting others in distributing or possessing with intent to distribute cocaine or cocaine base, *see* 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 18 U.S.C. § 2, and two counts of possessing a firearm in furtherance of a drug trafficking crime, *see* 18 U.S.C. § 924(c). The grand jury indicted Mr. Fernetus on three counts of distributing and possessing with intent to distribute various quantities of cocaine, *see* 21 U.S.C. § 841, four counts of aiding and abetting others in distributing or possessing with intent to distribute cocaine or cocaine base, *see* 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 18 U.S.C. § 2, and two counts of possessing a firearm in furtherance of a drug-trafficking crime, *see* 18 U.S.C. § 924(c). Mr. Ayap, Mr. Norgaisse, and Mr. St. Fleur were each charged with one count of aiding and abetting others in possessing cocaine or cocaine base with intent to distribute it, *see* 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 18 U.S.C. § (2).

7

Before trial, Mr. Gelin moved to suppress the evidence obtained as a result of the June 2016 traffic stop on the Florida Turnpike, arguing that the stop was a pretext for a drug search. After an evidentiary hearing, the district court denied the motion, finding that the traffic stop was reasonable under the Fourth Amendment because Mr. Gelin was speeding.

Also before trial, the government filed an information and notice of prior conviction, stating that Mr. St. Fleur was convicted in Florida of possession of cocaine on March 16, 2015. During trial, Mr. St. Fleur objected to the admission of this evidence, and the district court overruled the objection.

At the close of the government's case, Mr. Gelin, Mr. Ayap, Mr. Norgaisse and Mr. St. Fleur each moved for judgment of acquittal as to the conspiracy count. Mr. Gelin also moved for judgment of acquittal on the aiding and abetting and firearm counts against him, and Mr. Norgaisse moved for judgment of acquittal on the aiding and abetting count against him. The district court denied the motions. In addition, Mr. St. Fleur requested a buyer-seller jury instruction, and the district court denied his request.

After a seven-day trial, the jury found the defendants guilty as charged. The district court sentenced Mr. Gelin to 240 months of imprisonment on the drug counts, to be followed by a consecutive term of 60 months' imprisonment on the first gun count, all to be followed by 300 months' imprisonment on the second gun

8

count.  It sentenced Mr. Fernetus to 120 months of imprisonment on the drug counts, to be followed by a consecutive term of 60 months of imprisonment on the first gun count, all to be followed by another consecutive term of 300 months of imprisonment on the second gun count.  It sentenced Mr. Ayap to 120 months of imprisonment, Mr. Norgaisse to 240 months of imprisonment, and Mr. St. Fleur to 240 months of imprisonment.  All of their sentences constituted the respective statutory minimum terms.

This appeal followed.

### III

We begin our discussion by addressing the defendants' arguments challenging their convictions.

First, we evaluate Mr. Gelin's challenge to the denial of his motion to suppress.  Second, we analyze Mr. Gelin's, Mr. Ayap's, Mr. St Fleur's, and Mr. Norgaisse's sufficiency of the evidence arguments. Third, we consider the district court's admission of Mr. St. Fleur's prior conviction under Rule 404(b).  Finally, we discuss the district court's refusal to give a buyer-seller instruction.

### A

Mr. Gelin argues that the district court erred in denying his motion to suppress evidence obtained as a result of the June 8, 2016 traffic stop.  He asserts that law enforcement "invent[ed] probable cause" to stop him as a pretext for conducting a

9

narcotics search, and that driving six miles per hour over the speed limit is "too *de minimus*" to justify the stop.

When reviewing the denial of a motion to suppress, we review findings of fact for clear error and the application of law *de novo*. *See United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011). There is no error here. As the government argues, law enforcement had probable cause to stop Mr. Gelin for driving six miles per hour over the speed limit because, under Florida law, driving any speed on the Florida Turnpike that exceeds the posted limit is a moving violation. *See* Fla. Stat. §§ 316.187(3), 318.18(3)(B). On this record, we reject Mr. Gelin's argument that the stop was pretextual based on the Supreme Court's opinion in *Whren v. United States*, 517 U.S. 806, 813 (1996), which held that "the constitutional reasonableness of traffic stops" does not "depend[ ] on the actual motivations of the individual officers involved."

**B**

Mr. Gelin, Mr. Ayap, Mr. Norgaisse, and Mr. St. Fleur argue that the district court erred in denying their motions for judgment of acquittal on the conspiracy charge. Mr. Gelin also challenges the district court's denial of his motion for judgment of acquittal on the aiding and abetting and firearm charges against him, and Mr. Norgaisse argues that the government failed to present sufficient evidence of his identity. We review the sufficiency of evidence *de novo*, viewing the evidence

10

in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict. *See United States v. Duperval*, 777 F.3d 1324, 1331 (11th Cir. 2015).

**1**

Mr. Gelin, Mr. Ayap, Mr. Norgaisse and Mr. St. Fleur each separately challenge the sufficiency of the evidence on the conspiracy charge, arguing that the government failed to prove that they entered an agreement to distribute drugs. Instead, they assert, all the government established is that they purchased drugs, and a buyer-seller relationship is insufficient to prove the existence of a conspiracy.

"To sustain a conviction for conspiracy to distribute narcotics the government must prove that 1) an agreement existed between two or more people to distribute the drugs; 2) that the defendant at issue knew of the conspiratorial goal; and 3) that he knowingly joined or participated in the illegal venture." *United States v. Brown*, 587 F.3d 1082, 1089 (11th Cir. 2009). Although "a simple buyer-seller controlled substance transaction does not, by itself, form a conspiracy . . . a conspiracy can be found if the evidence allows an inference that the buyer and seller knew the drugs were for distribution[.]" *United States v. Achey*, 943 F.3d 909, 917 (11th Cir. 2019) (citation omitted). This may be inferred "when the evidence shows a continuing relationship that results in the repeated transfer of illegal drugs to the purchaser,"

11

and "from a drug transaction where the amount of drugs allows an inference of a conspiracy to distribute drugs." *Id.* (citations and internal quotation marks omitted).

As explained below, the government presented sufficient evidence that each of these defendants was a member of the charged conspiracy.

For instance, the government presented evidence that Mr. Gelin sold cocaine out of the two Orlando houses, ran the Orlando houses and took care of Mr. Gilles' customers when he was in Haiti, and transported cocaine from Miami to Orlando to maintain the cocaine supply. It also presented evidence that Mr. Ayap regularly purchased distribution-sized quantities of cocaine from Mr. Gilles, that Mr. Gilles would sometimes "front" Mr. Ayap crack cocaine, that Mr. Ayap would bring customers to the Orlando houses "to help" Mr. Gilles, and that Mr. Ayap told Mr. Gilles that his customers liked the product that he was obtaining from Mr. Gilles. A reasonable jury could find from this evidence that Mr. Gelin and Mr. Ayap were members of the charged conspiracy. *Cf. Brown*, 587 F.3d at 1090 (holding that the evidence was sufficient to prove that the defendants were participants in a conspiracy where the evidence showed that they helped each other "maintain a steady source of illegal drugs[,] . . . sold drugs on credit, for resale, brokered deals for each other, and shared customers and supplies").

A reasonable jury could also conclude that Mr. Norgaisse and Mr. St. Fleur knowingly joined the conspiracy from the evidence that (1) in 2017, Mr. Norgaisse

12

was purchasing an ounce to two-and-a-half ounces of cocaine at a time from the Orlando houses; (2) Mr. Norgaisse sometimes used Mr. St. Fleur to pick up distribution-sized quantities of cocaine from the houses; (3) Mr. Norgaisse's car was sometimes seen making multiple short visits to the Orlando houses on the same day, and Mr. St. Fleur's car was seen at both houses at least a dozen times; and (4) on April 11, 2017, when Mr. Norgaisse's car was stopped after leaving the 18th Street house, officers found 73 grams of cocaine hidden on Mr. St. Fleur, who was a passenger in the vehicle. *See Achey*, 943 F.3d at 917 (explaining that an agreement between a drug supplier and purchaser to distribute a controlled substance can be inferred from the fact that the amount of drugs purchased was enough "to supply many others"); *Brown*, 587 F.3d at 1089 ("[A]s is well established in this Circuit, where there are repeated transactions buying and selling large quantities of illegal drugs, that is sufficient evidence that the participants were involved in a conspiracy to distribute those drugs in the market."). Although Mr. Gilles testified that he did not "really know" Mr. St. Fleur, "[i]t is irrelevant that particular conspirators may not have known other conspirators or participated in every stage of the conspiracy[.]" *United States v. Alred*, 144 F.3d 1405, 1415 (11th Cir. 1998).

**2**

Mr. Gelin also argues that the government presented insufficient evidence of his aiding and abetting the possession with intent to distribute cocaine. This charge

13

was based on Mr. White's testimony that on March 8, 2016, he called Mr. Gelin to set up a cocaine purchase, Mr. Gelin told him to go to the 18th Street house, and when Mr. White went to the house, he picked up an ounce of cocaine from someone else. Mr. Gelin argues that this was insufficient to prove possession because he was not the one who showed up for the deal. We disagree.

"Possession may be actual or constructive[.]" *United States v. Woodard*, 531 F.3d 1352, 1360 (11th Cir. 2008) (citation and internal quotation marks omitted). "A defendant's constructive possession of a substance can be proven by a showing of 'ownership or dominion and control over the drugs or over the premises on which the drugs are concealed." *Id.* (citation and internal quotation marks omitted). The jury could infer from this testimony that Mr. Gelin constructively possessed the cocaine sold as he knew of its presence and exercised control over it by directing his distributor to sell it to Mr. White. *See United States v. Benbow*, 539 F.3d 1327, 1333 (11th Cir. 2008) ("Those who have property, including illegal drugs, moved by others at their direction and for their purposes constructively possess that property while it is being moved.").

In addition, Mr. Gelin challenges the sufficiency of the evidence for one of the § 924(c) charges against him, arguing that although a firearm was found in a residence that he rented, the government did not prove that it belonged to him. We are persuaded that there is enough other evidence in the record to support the jury's

14

verdict on this count, including undercover video of an April 20, 2016, cocaine sale transaction with Mr. White, which shows that Mr. Gelin was armed at the time, and Mr. Gilles' testimony that his organization members kept guns in the house to protect themselves and to protect the drugs.

**3**

Finally, Mr. Norgaisse also raises a different sufficiency of the evidence argument, asserting that he should have been acquitted on both the conspiracy and aiding and abetting charges against him because the government did not sufficiently prove his identity.  At trial, Mr. Gilles testified that he dealt drugs with and spoke on the intercepted telephone conversations with a person who used the alias "Phat Boi," and identified Mr. Norgaisse in court as Phat Boi.  Mr. Norgaisse claims that this is insufficient to establish his identity because "no witness linked the individual identified in the courtroom as 'Phat Boi' with the person named Gerardson Norgaisse charged in the Superseding Indictment[.]" *See* Mr. Norgaisse's Initial Br. at 15.

The government presented enough evidence for a reasonable jury to conclude that Mr. Norgaisse is Phat Boi.  "Identification of a defendant can be established by inference and circumstantial evidence." *United States v. Cooper*, 733 F.2d 91, 92 (11th Cir. 1984).  In addition to Mr. Gilles' in-court identification of Mr. Norgiasse, Officer Arocho testified that investigators identified phone calls on the wiretap as

15

coming from a phone subscribed to Mr. Norgaisse.  They connected those phone calls to vehicles that would arrive at the houses, which were under rental contracts with Mr. Norgasse.  The rental contracts also listed the phone number from the wiretap associated with Mr. Norgaisse as the contact number.

Another officer further testified that that on April 11, 2017, he performed a traffic stop of Mr. Norgaisse's vehicle and identified Mr. Norgaisse as the driver and Mr. St. Fleur as the passenger.  The stop occurred after Mr. Norgaisse's white Jaguar left the 18th Street house.  The officer testified that both consented to a search, and Mr. St. Fleur had 73 grams of cocaine hidden in his underwear.  Though the officers did not make an in-court identification of Mr. Norgaisse, a reasonable jury could infer from this evidence, coupled with Mr. Gilles' in-court identification of Mr. Norgaisse as Phat Boi, that Phat Boi was indeed Mr. Norgaisse.

Mr. Norgaisse also challenges the sufficiency of the evidence to support his conviction for possessing cocaine with intent to distribute it because, he submits, the government did not prove that he knew Mr. St. Fleur had cocaine when the April 11, 2017, traffic stop occurred.  A reasonable jury could conclude, however, that Mr. Norgaisse aided and abetted Mr. St. Fleur's possession of cocaine based on the evidence that officers stopped Mr. Norgaisse's car after it left the 18th Street house and from the testimony that Mr. Norgaisse sometimes sent "his boy" Mr. St. Fleur

16

to pick up cocaine for him.  *See* D.E. 336 at 17.  The district court, therefore, did not err in denying the defendants' motions for judgment of acquittal.

## C

Mr. St. Fleur contends that the district court erred by allowing the government to present evidence of his prior state-court conviction for possession of cocaine.  He argues that the district court did not identify a valid purpose for admitting this conviction under Rule 404(b) and that his prior conviction for cocaine *possession* is not probative of his intent to *distribute* cocaine.

"Federal Rule of Evidence 404(b) empowers courts to admit evidence of a defendant's other crimes when that evidence is used to prove, *inter alia*, the defendant's intent to commit the crime at issue."  *United States v. Smith*, 741 F.3d 1211, 1225 (11th Cir. 2013).  We review a district court's decision to admit evidence under Rule 404(b) for abuse of discretion.  *See Brown*, 587 F.3d at 1091.

Although the district court did not state which Rule 404(b)(2) purpose it was admitting the prior conviction for, we "may affirm 'for any reason supported by the record, even if not relied upon by the district court.'"  *United States v. Al-Arian*, 514 F.3d 1184, 1189 (11th Cir. 2008) (citation omitted).  We have previously rejected Mr. St. Fleur's argument that a prior conviction for drug possession is not probative of intent to distribute drugs.  *See United States v. Butler*, 102 F.3d 1191, 1196 (11th Cir. 1997) (holding that "evidence of prior personal drug use" is admissible "to prove

17

intent in a subsequent prosecution for distribution of narcotics"). We have also found prior convictions to be "probative of intent where, as here, the prior conviction was for possession of the same drug involved in the instant conspiracy." *Smith*, 741 F.3d at 1226 (holding that the district court did not abuse its discretion in admitting the defendant's prior convictions for *possession* of cocaine in his trial for conspiracy to *distribute* cocaine because they were probative of intent). Accordingly, the district court did not abuse its discretion in admitting Mr. St. Fleur's prior conviction.

**D**

At the close of the government's case-in-chief, Mr. St. Fleur requested that the district court give the following buyer-seller jury instruction:

> A buyer-seller relationship between a defendant and another person, standing alone, cannot support a conviction for conspiracy.

> The fact that a defendant may have bought Cocaine from another person is not sufficient without more to establish that a defendant was a member of the charged conspiracy.

> Instead, a conviction for conspiracy requires proof of an agreement to commit a crime beyond that of the mere sale.

D.E. 247; D.E. 340 at 216.

The district court refused to give this instruction without explaining its reasoning. Mr. St. Fleur and Mr. Gelin now challenge the district court's refusal to

18

give this instruction, which we review for abuse of discretion.  *See Duperval*, 777 F.3d at 1331.[1]

As discussed above, "a simple buyer-seller controlled substance transaction does not, by itself, form a conspiracy."  *Achey*, 943 F.3d at 917; *United States v. Dekle*, 165 F.3d 826, 830 (11th Cir. 1999) (explaining that "the existence of a simple buyer-seller relationship alone does not furnish the requisite evidence of a conspiratorial agreement") (citation and internal quotation marks omitted).  We have said that "[a]s long as there is some basis in the evidence and legal support, the jury should be instructed on a theory of the defense."  *United States v. Farias*, 836 F.3d 1315, 1328 (11th Cir. 2016) (citation and internal quotation marks omitted).  A district court's refusal to give a requested instruction, however, "warrants reversal only if the requested instruction was correct, the charge actually given did not substantially address it, and the failure to give the instruction seriously impaired the defendant's ability to present an effective defense."  *Id.* (citation and internal quotation marks omitted).

We think the better course here would have been to give the buyer-seller instruction, as the requested instruction was legally correct and the evidence (viewed in the light most favorable to Mr. St. Fleur and Mr. Gelin) could have been

---

[1] The district court had a standing ruling that an objection by one defendant stood as an objection for all defendants, so this issue is properly preserved for both Mr. Gelin and Mr. St. Fleur.

interpreted as showing only a buyer-seller relationship.  Nevertheless, we do not reverse on this basis because of binding precedent.  We have held that a conspiracy instruction—similar to the one given here—is sufficient to address the substance of a requested buyer-seller instruction.  *See United States v. Lively*, 803 F.2d 1124, 1129 (11th Cir. 1986) (holding that the trial court's jury charge on conspiracy "adequately and correctly covered the appellant's requested instruction on simple buyer/seller transactions").  *See also Farias*, 836 F.3d at 1329 (holding that "[t]he general conspiracy instruction given by the district court more than adequately met" the defendant's request for a buyer-seller instruction); *United States v. Brazel*, 102 F.3d 1120, 1140 (11th Cir. 1997) (holding that the district court's failure to instruct on the buyer-seller theory of defense was not error where the instruction given addressed the substance of the requested buyer-seller instruction).  Based on this precedent, we cannot hold that the district court abused its discretion in refusing to give the buyer-seller instruction.

## IV

We now turn to the challenges of Mr. Fernetus, Mr. Gelin, and Mr. St. Fleur to their sentences.  They argue that their mandatory minimum sentences violate separation of powers, due process, and the Eighth Amendment.  They also argue that their sentences are substantively unreasonable, and Mr. Gelin and Mr. Fernetus assert that the First Step Act should be applied to them.

20

**A**

We review the defendants' constitutional challenges to their sentences *de novo*. *See United States v. Brown*, 364 F.3d 1266, 1268 (11th Cir. 2004). Each of those constitutional arguments is foreclosed by our precedent or by Supreme Court precedent.

First, Mr. Fernetus, Mr. Gelin, and Mr. St. Fleur argue that mandatory minimum sentences violate separation of powers by requiring judges to defer to the legislature in imposing sentences, despite their individualized assessment of a case. We have rejected similar separation-of-powers challenges to mandatory-minimum sentences in three published opinions. *See United States v. Holmes*, 838 F.2d 1175, 1178 (11th Cir. 1988) (holding that the mandatory minimum sentence requirements did not violate separation of powers because "[i]t is for Congress to say what shall be a crime and how that crime shall be punished. . .") (quoting *United States v. Smith*, 686 F.2d 234, 239 (5th Cir. 1982)); *United States v. Paige*, 604 F.3d 1268, 1274 (11th Cir. 2010) (rejecting the defendant's argument that his mandatory minimum sentence violates separation of powers because it was foreclosed by *Holmes*); *United States v. Bowers*, 811 F.3d 412, 431 (11th Cir. 2016) (explaining that the defendant's "separation of powers challenge must fail" under *Holmes* and *Paige*). We are bound by these cases. *See Smith v. GTE Corp.*, 236 F.3d 1292, 1300 n.8 (11th Cir. 2001) ("Under the well-established prior panel precedent rule of this Circuit, the holding

21

of the first panel to address an issue is the law of this Circuit, thereby binding all subsequent panels unless and until the first panel's holding is overruled by the Court sitting en banc or by the Supreme Court.").

Second, Mr. St. Fleur asserts that the mandatory minimum sentencing scheme violates due process because it prevents the district court from making individualized sentencing determinations.  We rejected a similar due process argument in *Holmes*, and do so again here.  *See* 838 F.2d at 1177 (rejecting the defendant's argument that the mandatory minimum sentencing provisions of § 841(b)(1) violate due process because "it deprived him of an individualized sentencing proceeding").

Third, Mr. Fernetus—who was sentenced to 40 years of imprisonment—and Mr. Gelin—who was sentenced to 50 years of imprisonment—argue that their sentences constitute cruel and unusual punishment under the Eighth Amendment because they are grossly disproportionate to the gravity of their offenses.  Although we recognize the severity of these sentences, "Supreme Court and Eleventh Circuit precedent have set a high bar for a sentence to be 'grossly disproportionate.'" *Bowers*, 811 F.3d at 432.  For instance, in *Harmelin v. Michigan*, 501 U.S. 957, 995–96 (1991), the Supreme Court held that it was not "cruel and unusual" to impose a mandatory sentence of life without parole for a first-time

offender's possession of 672 grams of cocaine.  We have "never found a non-capital sentence of an adult to violate the Eighth Amendment."  *Bowers*, 811 F.3d at 432.

In view of *Harmelin*, Mr. Fernetus' and Mr. Gelin's sentences are not cruel and unusual.  Both were found to be responsible for the distribution of five kilograms or more of cocaine and 280 grams or more of cocaine base, both were convicted of two counts of possessing a firearm in furtherance of a drug trafficking crime, and both have criminal histories.  Their sentences, therefore, do not violate the Eighth Amendment.

**B**

Mr. Gelin, Mr. Fernetus, and Mr. St. Fleur also all challenge the substantive reasonableness of their sentences, which we review for abuse of discretion.  *See United States v. Dixon*, 901 F.3d 1322, 1348 (11th Cir. 2018).  We may "set aside a sentence only if we determine, after giving a full measure of deference to the sentencing judge, that the sentence imposed is truly unreasonable."  *United States v. Irey*, 612 F.3d 1160, 1191 (11th Cir. 2010) (en banc).  "As a result, we may reverse only if left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case."  *United States v. Stanley*, 739 F.3d 633, 655 (11th Cir. 2014) (citations and internal quotation marks omitted).

23

The district court sentenced each of the defendants to the mandatory minimum term of imprisonment required by statute. Each of their sentences fell below the statutory maximum of life imprisonment on the conspiracy count alone, *see* 21 U.S.C. § 841(b)(1)(A), and within the advisory guidelines range, which indicates that the sentences are reasonable. *See Stanley*, 739 F.3d at 656 ("A sentence imposed well below the statutory maximum penalty is an indicator of a reasonable sentence."); *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008) ("Although we do not automatically presume a sentence within the guidelines range is reasonable, we 'ordinarily . . . expect a sentence within the Guidelines range to be reasonable.'") (quoting *United States v. Talley*, 431 F.3d 784, 788 (11th Cir. 2005)).

In addition, Mr. Gelin's and Mr. Fernetus' sentences are reasonable in light of their extensive involvement in the conspiracy, possession of firearms, and criminal histories, as discussed above. Mr. St. Fleur's 20-year sentence is also reasonable given that he was held accountable for the distribution of five kilograms or more of cocaine and had a lengthy criminal history. Thus, the defendants are not entitled to relief from their sentences.

## C

Finally, Mr. Gelin and Mr. Fernetus argue that they are entitled to be resentenced based on Section 403 of the First Step Act. We review questions of

24

statutory interpretation *de novo*. *See United States v. Maupin*, 520 F.3d 1304, 1306 (11th Cir. 2008).[2]

Prior to the enactment of the First Step Act, a defendant convicted of more than one § 924(c) count faced a substantially longer mandatory minimum sentence on each count after the first. Specifically, § 924(c) required a sentence of not less than five years for the first § 924(c) count and not less than 25 years for each successive § 924(c) count, even if those counts were charged in the same indictment. *See generally Deal v. United States*, 508 U.S. 129, 134–37 (1993). Section 403 of the First Step Act amended § 924(c) to require a 25-year mandatory minimum sentence only for a violation of § 924(c) "that occurs after a prior conviction under [§ 924(c)] has become final." *See* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, 5221–22. Thus, if Section 403 of the Act applied to Mr. Gelin and Mr. Fernetus, they would not be subject to a 25-year mandatory minimum sentence for the second § 924(c) count charged against each of them in the indictment.

Section 403(b) of the Act provides: "This section, and the amendments made by this section, shall apply to any offense that was committed before the date of enactment of this Act, *if a sentence for the offense has not been imposed* as of such date of enactment." *Id*. at 5222 (emphasis added). Mr. Gelin's and Mr. Fernetus'

---

[2] Mr. Gelin concedes in his reply brief that the First Step Act does not apply to him, but Mr. Fernetus does not make the same concession, so we address this argument on the merits.

sentences were imposed on June 15, 2018, prior to the Act's December 21, 2018 enactment. *See id.* Although their cases were pending on appeal, the Act does not apply to them because their sentences had already been "imposed." *See, e.g.*, *United States v. Aviles*, 938 F.3d 503, 510 (3d Cir. 2019) ("'Imposing' sentences is the business of the district courts, while courts of appeals are tasked with reviewing them by either affirming or vacating them."); *United States v. Pierson*, 925 F.3d 913, 927 (7th Cir. 2019) ("In common usage in federal sentencing law, a sentence is 'imposed' in the district court, regardless of later appeals.").[3]

## V

For the foregoing reasons, we affirm the defendants' convictions and sentences.

**AFFIRMED.**

---

[3] We have reached the same result in unpublished cases. *See, e.g.*, *United States v. Ruff*, 795 F. App'x 796, 797 (11th Cir. 2020); *United States v. Garcia*, 2019 WL 7503482, at *1 (11th Cir. 2019).